**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATHAN AMORUSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| R1 RCM INC., an Illinois corporation; | ) | **JURY DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, NATHAN AMORUSO ("Plaintiff", or "Nathan"), by and through his attorney, Peter A. Cantwell of Cantwell & Cantwell, for his complaint at law against Defendant, R1 RCM INC. ("Defendant" or "R1"), states as follows:

### NATURE OF ACTION

1. This lawsuit arises under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA") for R1's interference with Nathan's legally entitled right to take a leave of absence for his serious medical condition, after he had advised his superiors at R1 of the need for such leave and under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., as amended ("ADA") for Defendant's discrimination against Nathan on the basis of his disability as well as a related state law claim regarding breach of contract.

### PARTIES

2. Plaintiff, Nathan Amoruso at all times relevant to this dispute was a resident of Cook County, Illinois.

3. Defendant R1 RCM Inc. is an Illinois corporation with a principal place of business at 401 N Michigan Ave #2700, Chicago, Illinois, 60611.

4. Nathan was employed by R1 as a Senior Vice President until his termination in October 2017.  Nathan was responsible for managing Defendant's operations in several states including Illinois, Indiana, and Michigan.  Additionally, he managed R1's overseas operations in India.

JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under the express provisions of the FMLA, 29 U.S.C. § 2617(a)(2), the ADA, 42 U.S.C. § 2000e-5(f)(3) and under 28 U.S.C. § 1331.  Pursuant to 42 U.S.C. § 1367, this Court also has the power to hear and adjudicate the plaintiff's concurrent claims arising under state law.

6. Venue is proper in the Northern District of Illinois, Eastern Division because R1's principal place of business is in Chicago, Illinois.

FACTUAL ALLEGATIONS

7. Nathan was employed by R1 and its predecessors from August 2007 through October 17, 2017.

8. Nathan consistently outperformed his peers at R1, and annually received financial rewards based on his superlative performance.

9. Based on his dedication and commitment to R1, Nathan was promoted to Senior Director in April 2010 and promoted to Vice President in December 2012.

10. During his employment, Nathan's responsibilities at the company continually grew.  At the time of his termination, he was responsible for operational leadership for R1's shared service centers located in Chicago, Illinois, Detroit, Michigan, Indianapolis, Indiana, and Stevens Point, Wisconsin.  These service centers collectively served 101 hospitals.

11. Additionally, Mr. Amoruso also led R1's rapidly expanding India operations. Between 2007 and 2017, R1's India operations expanded to include service centers in the cities of Gurgon, Nodia, Tikri, and Hyderabad.

12. The number of employees supervised by Nathan in India grew from 800 to over 2,800 at these four separate service centers. Nathan was responsible for the following departments: Billing, Follow-up, Cash Posting, Credit, and Medical Coding & Transcription.

13. At all times, Nathan was more than capable of performing his essential job functions at R1, with reasonable accommodations.

14. Nathan's job functions required him to work in excess of 60 hours a week and he was frequently required to travel extensively.

15. Additionally, Nathan had to make quarterly trips to India that often times lasted at least two or more weeks. During his tenure at R1, and because of his ever-expanding portfolio of responsibilities, Nathan rarely saw his family.

**R1 FREQUENTLY REWARDED NATHAN'S ELITE JOB PERFORMANCE**

16. R1 compensated Nathan for his efforts at the company with high pay and lucrative stock options.

17. On July 9, 2015, Nathan received 15,335 units of R1 stock in a Restrictive Stock Award ("RSA"). At the time he was terminated, 7,666 RSA units remained unvested.

18. Beginning in January 2016, R1 was entering into a partnership with Tower Brook Capital. While this transaction was being considered and consummated, R1 was concerned about retention of its top executives. To incentivize employees to stay with R1, the company gave lucrative stock options to its top talent during this tumultuous period.

19. On December 8. 2016, under R1's long term incentive plan, Nathan was granted 18,906 restricted stock units ("RSU"), and 62,850 stock options with a grant price of $2.42.

20. At the time Nathan was terminated, R1 revoked 7,856 of the options that had already vested under the long-term incentive plan.

21. On January 27, 2016, Nathan was awarded 79,310 units of stock in the form of a Restrictive Stock Award (the "January 27 RSA"). This RSA was to vest annually on February 16 over a period of three years.

22. The terms of the January 27 RSA provided that the units would accelerate and vest in full if Nathan was terminated by the company without cause.

23. Because of his superior-performance Nathan was promoted to Senior Vice President in March of 2017. As part of his promotion Nathan was awarded 75,000 stock options with a grant price of $3.10.

24. On April 4, 2017, Nathan was awarded 70,000 stock options with a purchase price of $3.10 per share. The April 4, 2017 stock options were scheduled to have vested in equal increments annually through 2021.

25. On August 14, 2017, pursuant to R1's Amended and Restated 2010 Stock Incentive Plain (the "Incentive Plan"), Nathan was awarded 53,565 performance based restricted stock units ("PBRSU"). These PBRSU had a time-based and a performance-based vesting condition. Based on the value of R1's stock, the performance-based condition, Nathan would have been entitled to the full value of the PBRSUs. Those shares were scheduled to have vested on December 31, 2020.

26. Also, in 2017 R1 did a fair value swap for 110,200 of Nathan's existing fully vested stock options and issued 55,628 new options to Nathan.

27. Shortly before his termination, R1 was discussing with Nathan the company's expansion into California, the importance that Nathan oversee operations in India, and had asked Nathan to lead the intermountain health transition to shared services, with Logan Johnston ("Logan").

28. Logan was Nathan's direct supervisor and an Executive Vice President. Logan never raised any performance issues with Nathan.

29. As recently as September of 2017 Nathan had a lunch with Tom Lesica, the Chief Operating Officer at R1 to discuss his continued future role at the company and the next steps to his promotion to Executive Vice President.

30. Nathan's performance at R1 was never once called into question by executives at the company before his termination by the company.

**NATHAN HAD AN ALCOHOL DISABILITY THAT R1 KNEW ABOUT**

31. Beginning on December 16, 2009, Nathan began a destructive and unhealthy relationship with alcohol that eventually led to two convictions for driving under the influence of alcohol ("DUI") and a diagnosis of "alcohol dependence."

32. On March 15, 2011, after his second arrest for DUI Nathan was evaluated at the Henry Ford Behavioral Health System's Maplegrove Center in West Bloomfield, Michigan, where he was diagnosed with alcohol dependence. Following this diagnosis, Nathan began several months of intense inpatient treatment to gain control of his alcohol dependence and end his relationship with alcohol. Nathan successfully completed his treatment and remained sober for several years.

33. R1, which at the time was known as Accretive Health, has always been aware of Nathan's history with alcohol and his diagnosis of alcohol dependence throughout his employment with R1. Nathan's first and second DUI were related to overconsumption at work events where R1 provided the alcohol.

5

34. Senior management at R1 actively encouraged a culture of drinking at work sponsored events.

35. Further, on June 21, 2011, John Sparby who at the time was a Senior Vice President of Operations at Accretive Health, sent a letter of support on behalf of Nathan to the Hon. William J. Richards of the 46th District Court of Michigan, who was the Judge presiding over Nathan's DUI proceedings.

36. Mr. Sparby's letter, extolled the importance that "Nathan has in leading [their] operations."

37. Mr. Sparby purposely sent this letter to ensure Nathan's continued ability to travel to enable him to continue his important work for R1's India operations.

38. Even while Nathan was receiving inpatient therapy for his alcohol dependence, he never allowed treatment to interfere with his work for R1.

39. Because Nathan was able to continue working and traveling on the same intense schedule as before his diagnosis, R1 ignored his alcohol dependence and subsequent treatment and acted to utilize and ensure his continued profitable management at R1.

STRESS AND RELAPSE

40. Eventually, the stress caused by long work hours and the exhaustive travel requirements of his positions began to take its toll on Nathan, causing him to relapse in his alcohol dependence, and causing him to begin drinking again in 2015.

41. However, at no point did Nathan's drinking have an impact on his job performance. Ultimately, and at all times until his termination, Nathan was extremely successful at R1. In fact, R1 recognized his continued contributions and promoted Nathan to Senior Vice President in the Spring of 2017.

42. Although, Nathan's relapse did not negatively impact his job performance, it did begin to negatively affect his health. On September 12, 2017, Nathan received a report from his doctors detecting elevated levels of alanine aminotransferase ("ALT") and Gamma-glutamyltransferase ("GGT") in his blood.

43. Nathan's doctor informed him that these elevated levels of ALT and GGT were caused by damage to his liver. Based on these test results and after consultation with his doctor, Nathan realized that alcohol had once again became a problem in his life and was killing him.

44. Following this report, Nathan's disease, and his inability to control his disease culminated into an episode where Nathan parked his car on a bridge, went to the edge of the bridge and considered jumping to his death. Nathan sincerely believes that but for the intervention of several nearby construction workers he would have jumped.

45. Shortly after his medical report, and while away at conducting business at R1's India locations, Nathan began to notice acute complications arising from his damaged liver. He noticed unexplained bruising on his body, and his complexion began to appear jaundiced.

**R1's Culture of Drinking and Partying Fostered Relationships Among Coworkers**

46. Throughout Nathan's employment at R1, the company nurtured a culture of partying centered around alcohol and fraternization with coworkers.

47. On information and belief, at no point during Nathan's employment was there a policy that prohibited relationships among coworkers.

48. On information and belief, fraternization among coworkers was widely accepted by R1, and alcohol played a substantial role in the activities of R1's employees.

49. Beginning in 2016, Nathan entered into a consensual intra-office relationship and friendship with a co-worker named Janyl ("Janyl"). This relationship was fully consensual and occurred outside of work.

50. The relationship mostly occurred over text messages and rarely materialized in a physical way. During the relationship, Nathan did not have direct supervisory authority over Janyl.

51. On October 10, 2017, Janyl made an official complaint to R1 alleging sexual harassment by Nathan.

52. The allegations were consistently denied by Nathan and no proof of sexual harassment ever materialized from R1's investigation.

53. On October 10, 2017, the week after Nathan returned from this trip to India, he was suspended from work, his work laptop was seized, and he was told not to enter company property until further notice.

54. Barred from work, without any explanation for his sudden suspension, Nathan began to drink even more heavily but stayed in Detroit until Friday October 13, 2017. On Friday, having heard nothing from R1, he returned home in Chicago.

55. On his return, Nathan had many discussions with his wife, family, medical professionals, and close friends about the dangerous trajectory his life was on and alcohols contribution to his many travails.

56. On the weekend of October 14 and October 15, Nathan resolved to admit himself into an alcohol rehabilitation facility.

AMORUSO REQUESTS LEAVE PURSUANT TO THE FMLA

57. On Sunday October 15, 2017 at 6:50 p.m., Nathan called Michelle Shemanski, the Human Resources Director at R1, notifying her that he was seeking treatment for alcohol dependency.

They spoke for over 25 minutes.

58. Nathan called Michelle Shemanski again at 7:15 p.m. In addition to notifying R1's Human Resource Director, Nathan notified R1's Chief Financial Officer ("CFO") and Treasurer Christopher Ricuarte that he was intending to take leave under the FMLA for inpatient treatment of his alcohol dependence.

59. On October 15, 2017 Nathan called Jackie E. Weitzenfeld, the CFO's personal assistant, and left a voice mail. Ms. Weitzenfeld returned his call at 9:00 PM and they spoke for 12 minutes.

60. On Monday October 16, 2017 at 7:46 AM Nathan once again called Michelle Shemanski to confirm with her that he was taking FMLA leave and was going to check himself in to inpatient treatment for his alcohol dependency.

61. Pursuant to R1 policy, on October 16, 2017 at 10:19 AM, Nathan called Met Life to request paperwork for FMLA leave.

62. On October 16, 2017 at 10:31 AM, Nathan called Logan Johnston, Executive Vice President of Central Operations at R1 and Nathan's immediate superior, and informed Johnston that he was checking himself into a residential rehabilitation center for treating alcohol dependency.

63. At 1:47 P.M. Nathan called Christopher Ricuarte to inform him that he chose to enter treatment for his alcohol dependency. Nathan also informed Christopher Ricuarte that Logan Johnston was already aware that Nathan was seeking treatment.

64. On October 16, 2017, at 4:02 PM Nathan was admitted into the Key to Recovery Program at Presence Holy Family Medical Center ("Presence") for inpatient treatment of his alcohol dependency.

65. Nathan was placed under the care of Dr. Stanley Tomezyk. Presence is a residential

rehabilitation center that treats alcoholics located in Des Plaines, Illinois.

66. Despite R1's culture of partying and events centered around alcohol and despite no specific provision against relationships between employees, R1 fired Nathan without cause due to his request to take leave under the FMLA.

67. At that point, R1's investigation had returned no reliable evidence of misconduct by Nathan.

68. The unsubstantiated complaint by Janyl, which included a presentation of a doctored cell phone conversation between Janyl and Nathan, formed the basis for R1's pretextual firing of Nathan.

69. On October 17, 2017, after Nathan was already sequestered at Presence for inpatient treatment and with no outside communication to the world, R1 sent a letter by courier from Robert Luse, R1's Executive Vice President of Human resources, informing Nathan that his employment had been terminated effective that same day, October 17, 2017. This letter was delivered to Nathan's wife at 5:02 p.m. on October 17, 2017.

70. Nathan was at Presence receiving treatment for his alcohol dependence when this letter was delivered to his house.

71. After having been a valued and important member of R1 for over 10 years, R1's termination letter signed by Robert Luse offered no explanation about why Nathan was suddenly being terminated. Because Nathan was sequestered at Presence, he did not learn of R1's termination or the alleged reasons for his termination until after his discharge from treatment.

72. Nathan, because of his request for leave to seek treatment for his alcohol dependence, received disparate treatment from a similarly situated co-worker. For example, Janyl, who missed the exact same meeting Nathan was terminated for missing was never terminated or otherwise

disciplined by R1.

73. When R1 canceled his insurance, Nathan was prematurely released from treatment by Presence on October 31, 2017.

74. Fortunately, Nathan was able to secure treatment for chemical dependency with the Hazelden Betty Ford Foundation in Chicago on November 13, 2017.

75. At that point, had he not been terminated by R1 while on FMLA leave, he would have been more than capable of performing all of the duties expected of him by R1 upon the completion of the chemical dependency program.

### COUNT I VIOLATION OF THE FAMILY MEDICAL LEAVE ACT 29 U.S.C. § 2615 (a)(1)
(INTERFERENCE)

76. The Plaintiff realleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

77. At all times relevant to this dispute, Defendant was a covered employer as defined in 29 U.S.C. § 2611.

78. At all times relevant to this dispute, Nathan was an eligible employee, as defined in 29 U.S.C. § 2611.

79. Nathan had a serious health condition as defined under the FMLA § 2611(11)

80. Nathan provided adequate notice to R1 of his need for a medical leave by giving notice as soon as he became aware of the need for leave and as soon as was practicable, pursuant to 29 U.S.C. § 2612 (e)(2)(B).

81. Nathan was entitled to an unpaid FMLA leave to enable him to enter a residential treatment facility for his alcohol dependence.

82. R1's failure to allow Nathan to take an unpaid leave and its subsequent termination of his employment constitutes an unlawful interference with his FMLA rights.

83. Had Nathan not sought out and taken FMLA leave, he would not have been terminated from his position with Defendant.

84. As a result of R1's actions, Nathan has suffered damages under 29 U.S.C. § 2617(a) including: (i) wages, salary, employment benefits, stock options, other stock benefits, and other compensation lost as a result of R1's interference with Nathan's FMLA Leave; (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; (iii) an additional amount of liquidated damages equal to. the sum of the amount described in clauses (i) and (ii).

85. Further, as a result of R1's actions Nathan has suffered a reduction of income and future employment prospects. Therefore, Nathan requests pursuant to 29 U.S.C. § 2617 (a)(1)(B) equitable relief including, but not limited to, reinstatement to his former position and restoration of his former salary, benefits, bonuses, and stock options.

86. Additionally, Nathan is entitled to be reimbursed by Defendant for his reasonable attorney's fees and other costs

WHEREFORE, Plaintiff, Nathan Amoruso, respectfully requests that this Court find in his Favor and award damages equal to:

(i)     all wages, salary, employment benefits, stock option, and other compensation lost as a result of R1's interference with Nathan's FMLA Leave;

(ii)    interest on the above amount at the prevailing rate;

(iii)   an additional amount as liquidated damages equal to the sum of the amounts described in (i) and (ii) above;

(iv)    reinstatement to his former position at R1 which Plaintiff would have enjoyed but for the wrongful interference with his rights under the FMLA including restoration

of his former salary, benefits, bonuses and stock options, or in the alternative, damages equal thereto.

(v)     His attorney's fees and costs

(vi)    And for all other further relief as this Court deems just and proper

## COUNT II VIOLATION OF THE FAMILY MEDICAL LEAVE ACT 29 U.S.C. § 2615 (a)(2)
### (RETALIATION)

87. The Plaintiff realleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

88. At all times relevant to this dispute, Defendant was a covered employer as defined in 29 U.S.C. § 2611.

89. At all times relevant to this dispute, Nathan was an eligible employee, as defined in 29 U.S.C. § 2611.

90. Nathan had a serious health condition as defined under the FMLA § 2611(11)

91. Nathan provided adequate notice to R1 of his need for a medical leave by giving notice as soon as he became aware of the need for leave and as soon as was practicable, pursuant to 29 U.S.C. § 2612 (e)(2)(B).

92. Nathan was entitled to an unpaid FMLA leave so that he could enter a residential treatment facility for his alcohol dependence.

93. R1 illegally retaliated against Nathan for exercising his right to take leave for a serious health condition under the FMLA and discharged him.

94. Had Nathan not sought out and taken FMLA leave he would not had been terminated from his position with Defendant.

95. As a result of R1's actions Nathan has suffered damages under 29 U.S.C. § 2617(a) including: (i) wages, salary, employment benefits, stock options, other stock benefits, and other

compensation lost as a result of R1's interference with Nathan's FMLA Leave; (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; (iii) an additional amount of liquidated damages equal to. the sum of the amount described in clauses (i) and (ii).

96. Further, as a result of R1's actions, Nathan has suffered a reduction of income and future employment prospects. Therefore, Nathan requests pursuant to 29 U.S.C. § 2617 (a)(1)(B) equitable relief including, but not limited to, reinstatement to his former position and restoration of his former salary, benefits, bonuses and stock options.

97. Additionally, Nathan is entitled to be reimbursed by Defendant for his reasonable attorney's fees and other costs.

WHEREFORE, Plaintiff, Nathan Amoruso, respectfully requests that this Court find in his Favor and award damages equal to:

 (i)  all wages, salary, employment benefits, stock option, and other compensation lost as a result of R1's interference with Nathan's FMLA Leave;

 (ii)  interest on the above amount at the prevailing rate;

 (iii)  an additional amount as liquidated damages equal to the sum of the amounts described in (i) and (ii) above;

 (iv)  reinstatement to his former position at R1 which Plaintiff would have enjoyed but for the wrongful interference with his rights under the FMLA including restoration of his former salary, benefits, bonuses and stock options and other incentive compensation, or in the alternative, damages equal thereto.

 (v)  His attorney's fees and costs

 (vi)  And for all other further relief as this Court deems just and proper.

## COUNT III VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

98. The Plaintiff realleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

99. At all times relevant to this dispute, Defendant was a covered entity, as defined in 42 U.S.C. § 12111.

100. Plaintiff's alcohol dependency is a disability, within the meaning of the ADA

101. Plaintiff, with reasonable accommodations is a qualified individual, able to perform the essential function of the position of Senior Vice President, or other similarly high functioning managerial positions.

102. Defendant failed to make reasonable accommodations to allow Nathan's disability after he asked for a leave of absence to achieve remission of his alcohol dependence.

103. Defendant interfered with Nathan's reasonable request to take a leave of absence within the meaning of the ADA.

104. Nathan's alcohol dependence was a motivating factor in Defendant's determination not to give him a leave of absence.

105. Nathan's disability was a motivating factor in Defendant's determination that Nathan should be terminated from his employment, rather than be given reasonable accommodations so that he could function in his position.

106. Defendant's actions were intentional and made with malice and reckless indifference to Plaintiff's rights to have reasonable accommodations made for his disability under the ADA.

107. As a result of Defendant's actions, Plaintiff has suffered significant damages, including loss of income, loss of stock options, loss of other stock benefits, and emotional distress.

108. Under the ADA Plaintiff is entitled to damages in an amount equal to all back pay, lost stock options, prejudgment interest, and additional amount as punitive damages.

109. Additionally, Plaintiff is entitled to have her reasonable attorney's fees and other costs paid by Defendant.

WHEREFORE, Plaintiff, Nathan Amoruso, respectfully requests that this Court find in his Favor and award damages equal to:

(i)     all wages, salary, employment benefits, stock option, and other compensation lost as a result of Nathan's termination by R1;

(ii)    interest on the above amount at the prevailing rate;

(iii)   punitive damages;

(iv)    reinstatement to his former position at R1 which Plaintiff would have enjoyed but for the wrongful interference with his rights under the FMLA including restoration of his former salary, benefits, bonuses and stock options and other incentive benefits, or in the alternative, damages equal thereto.

(v)     His attorney's fees and costs

(vi)    And for all other further relief as this Court deems just and proper

## COUNT IV BREACH OF CONTRACT

110. The Plaintiff realleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

111. Pursuant to certain grants of, RSA, Nathan was entitled to have all of his options vest at the time of his termination from his employment from R1 without cause.

112. Cause is defined as:

(i)your gross negligence or willful misconduct in the performance of your duties to the Company; (ii) your material and willful violation of any federal or state law that

16

if made public would injure the business or reputation of Company; (iii) your refusal or willful failure to comply with any specific lawful direction or order of Company or the material policies and procedures of Company; (iv) your conviction (including a plea of *nolo contendere*) of a felony, or of a misdemeanor that would have a material adverse effect on Company's goodwill if you were to be retained as an employee of Company; or (v) your substantial and continuing willful refusal to perform duties ordinarily performed by an employee in the same position and having similar duties as you. In each case as reasonably determined by the Board or the board of directors of the successor to Company.

113. Nathan was never terminated for cause as defined by the January 27, 2016 RSA.

114. Further, upon his termination Nathan had been fully vested in 7,856 stock options from R1's long-term incentive plan. R1 breached its contract with Nathan by revoking the vested stock options from Nathan because of his termination.

WHEREFORE, Plaintiff, Nathan Amoruso, respectfully requests that this Court find in his favor and award damages equal to:

(i)     all wages, salary, employment benefits, stock options and other incentive benefits, and other compensation lost as a result of Nathan's termination by R1;

Respectfully submitted,
Nathan Amoruso


By: /s/Peter A. Cantwell_____
    One of his Attorneys

Peter A. Cantwell, Esq.
CANTWELL & CANTWELL
30 North LaSalle, Suite 2850
Chicago, IL  60602
(312) 372-3000
peterc@cc-legal.com